**VENABLE LLP**
Jeffri A. Kaminski (PA Bar No. 79229)
jakaminski@Venable.com
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

Frank C. Cimino, Jr. (pro hac vice forthcoming)
fccimino@Venable.com
Megan S. Woodworth (pro hac vice forthcoming)
mswoodworth@Venable.com
Jason M. Dorsky (pro hac vice forthcoming)
jmdorsky@Venable.com
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

*Attorneys for Plaintiff SAP America, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SAP AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PULSELINK SYSTEMS, LLC, and SIGNAL POINT NETWORKS, LLC,<br><br>Defendants. | **Civil Action No. __________**<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff SAP America, Inc. ("SAP") brings this Complaint against Defendants PulseLink Systems, LLC ("PulseLink") and Signal Point Networks, LLC ("Signal Point") (collectively, "Defendants"). In support of this Complaint for Declaratory Judgment, SAP alleges as follows:

## NATURE OF THE ACTION

1. This is an action for declaratory judgment of non-infringement of U.S. Patent Nos. 10,782,981 (the '981 Patent), 7,698,385 (the '385 Patent), 9,787,749 (the '749 Patent), 9,602,634 (the '634 Patent), 8,165,030 (the '030 Patent), 7,660,830 (the '830 Patent), and

9,356,915 (the '915 Patent) (collectively, the "Asserted Patents"), under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the patent laws of the United States, 35 U.S.C. § 101 et seq., and for other relief the Court deems just and proper.

2. SAP is a global leader in enterprise applications and business AI software located in Newtown Square, Pennsylvania, within Delaware County and this District. SAP's product offerings include, among other things, cloud platforms, integration and event-messaging services, monitoring services, database and data-integration products, and related offerings.

3. PulseLink purports to own the '981, '385, '749, and '634 Patents (collectively, the "PulseLink Patents"). Signal Point purports to own the '030, '830, and '915 Patents (collectively, the "Signal Point Patents").

4. SAP seeks a declaratory judgment that its products and services, including the SAP products and services accused in Defendants' September 12, 2026 infringement letter directed and delivered to SAP at its Newtown Square, Pennsylvania location within this District, and related SAP products and services (collectively, the "Accused Products"), do not infringe and have not infringed, directly or indirectly, any claim of the Asserted Patents, either literally or under the doctrine of equivalents.

5. An actual, substantial, and immediate controversy exists between SAP and Defendants regarding alleged infringement of the Asserted Patents, arising from Defendants' express allegations of infringement, preservation demands, and demands for a patent license, directed and delivered to SAP at its Newtown Square, Pennsylvania location.

## FACTUAL BACKGROUND

6. SAP develops, markets, operates, supports, and offers enterprise software and cloud-based products and services that enable customers to build, integrate, deploy, manage, monitor, and operate applications, communications, and data in modern computing environments.

7. PowerBridge Networks, LLC ("PowerBridge") purports to be and has acted as Defendants' licensing and enforcement agent and representative.

8. On May 23, 2026, Defendant PulseLink Systems, LLC sent SAP a written letter that identified a "substantial" Avaya-origin portfolio and named various SAP products and services that "appear relevant" to the "themes" throughout the portfolio. *See* Ex. A (May 23, 2026 PowerBridge Notice Letter) at 1. The May 23 letter stated: "Based on publicly available information and our review of technical materials, we believe there is strong and direct alignment between SAP offerings and technologies covered by this portfolio." *Id.* at 2. The May 23 letter was sent to SAP at 3999 West Chester Pike, Newtown Square, Pennsylvania 19073, located within Delaware County.

9. The May 23 letter explains that "PulseLink Systems, LLC, together with Signal Point Networks, LLC, owns this portfolio, and PowerBridge Networks, LLC manages related licensing opportunities." *Id.* The May 23 letter was signed by Donald Bitting as Founder and Chief Executive Officer of PulseLink Systems, LLC. *Id.*

10. On September 12, 2026, PowerBridge sent another letter to SAP at its Newton Square address. In its September 12 letter, PowerBridge stated that it was writing on behalf of PulseLink, Signal Point, and the applicable owners of the patents identified in the letter. *See* Ex. B (Sept. 12, 2026 PowerBridge Notice Letter) at 1.

11. The September 12 letter confirmed that the May 23 letter was delivered to SAP at 3999 West Chester Pike, Newtown Square, Pennsylvania, on May 29, 2026. The September 12 letter states that SAP responded to the May 23 letter on July 14, 2026 and requested a discussion. *See* Ex. B at 1.

12. The September 12 letter was signed by Donald Bitting as Founder and Chief Executive Officer of PowerBridge Networks, LLC. *Id.*

13. The September 12 letter again referred to the "substantial Avaya-origin portfolio" identified in the May 23 letter. *Id.* The September 12 letter also acknowledged that the May 23 letter "did not identify any patent by number and did not charge any specific claim." *Id.*

14. The September 12 letter stated that it was "the first communication" to "expressly charge[s] SAP with infringement" of the seven Asserted Patents, identified specific asserted

claims, identified accused SAP products and functionality, and stated that the letter was intended to provide actual notice under 35 U.S.C. § 287(a). *See* Ex. B at 1-4.

15. The September 12 letter did not identify any patents other than the seven Asserted Patents from the alleged "substantial Avaya-origin portfolio," and did not charge SAP of infringing any patents other than the seven Asserted Patents. *Id.* However, the September 12 letter continued to reference the alleged "substantial Avaya-origin portfolio." *Id.* On information and belief, this was done, at least in part, to compel SAP to engage in licensing discussions with Defendants under threat of possible future patent assertions based on some unidentified number of unidentified patents, despite Defendants having no reasonable basis to charge SAP of infringement of any other patent in the alleged "substantial Avaya-origin portfolio." In this regard, the September 11 letter stated that PowerBridge was willing to engage SAP in discussions "directed toward a commercial portfolio license resolving SAP's exposure." *Id.* at 5.

16. For the '981 Patent, Defendants accused "SAP Business Technology Platform Cloud Foundry Runtime, including the managed Cloud Foundry environment implementing Diego, Route Emitter, Gorouter and TCP Router, and Application Router layers, and the dynamic assignment, advertisement, and failover reassignment of ports and application instances within that runtime" ("'981 Patent Accused Products"). Defendants identified Claims 1, 3, 4, 5, 9, 11, 12, and 15 ("'981 Patent Asserted Claims"). *See* Ex. B at 2.

17. For the '385 Patent, Defendants accused "SAP Integration Suite, including Cloud Integration integration flows (iFlows), API Management, Open Connectors, and Integration Advisor" ("'385 Patent Accused Products"). Defendants identified Claims 1, 3, 4, 7, 9, 10, and 11 ("'385 Patent Asserted Claims"). *See* Ex. B at 2.

18. For the '749 Patent, Defendants accused "SAP Integration Suite, advanced event mesh, including the distributed multi-broker event-mesh and event-streaming platform within SAP Business Technology Platform and SAP Integration Suite, formerly SAP Event Mesh and Advanced Event Mesh" ("'749 Patent Accused Products"). Defendants identified Claims 1, 2, 5, 8, 9, 15, and 20 ("'749 Patent Asserted Claims"). *See* Ex. B at 2-3.

19. For the '634 Patent, Defendants accused "SAP Integration Suite Cloud Integration together with SAP Cloud ALM Integration and Exception Monitoring and message tracking, including the assignment, propagation, and logging of correlation identifiers and message identifiers across integration hops" ("'634 Patent Accused Products"). Defendants identified Claims 1, 11, 12, 17, 18, and 19 ("'634 Patent Asserted Claims"). *See* Ex. B at 3.

20. For the '030 Patent, Defendants accused "SAP Cloud ALM for operations, including Integration and Exception Monitoring and Real User Monitoring, and associated topology, scenario, collector, and agent monitoring of integration and user communications" ("'030 Patent Accused Products"). Defendants identified Claims 1, 2, 3, 6, 7, and 16 ("'030 Patent Asserted Claims"). *See* Ex. B at 3.

21. For the '830 Patent, Defendants accused "SAP HANA Smart Data Integration and SAP Landscape Transformation; SAP Datasphere Data Integration, Replication Flows, Transformation Flows, and Data Flows; SAP Master Data Integration, Business Data Orchestration, and the SAP S/4HANA Data Replication Framework, including key and value mapping and Cloud Integration iFlows and APIs used to keep heterogeneous stores consistent; and SAP Adaptive Server Enterprise, including Always-On and HADR configurations, SAP ASE Cluster Edition, Component Integration Services, and SAP Replication Server when used with ASE as a primary, companion, replicate, or consolidated target in homogeneous or heterogeneous replication topologies with Oracle, IBM Db2, Microsoft SQL Server, SAP HANA, SAP IQ, or other supported data servers" ("'830 Patent Accused Products"). Defendants identified Claims 1-8, 12, and 13 ("'830 Patent Asserted Claims"). *See* Ex. B at 3-4.

22. For the '915 Patent, Defendants accused "SAP Joule realtime voice agents and intelligent voice capabilities embedded across S/4HANA, SuccessFactors, Ariba, and other SAP applications, including the LiveKit Cloud WebRTC infrastructure and its embedded TURN server used to relay real-time media" ("'915 Patent Accused Products"). Defendants identified Claims 1, 2, 3, 8, and 9 ("'915 Patent Asserted Claims"). *See* Ex. B at 4.

23. The September 12 letter stated that the patent owners affirmatively charged SAP with direct infringement of the Asserted Patents under 35 U.S.C. § 271(a): "The descriptions in

this letter are affirmative charges of infringement. The patent owners contend that SAP directly infringes the identified claims under 35 U.S.C. § 271(a) by making, using, offering to sell, selling, and importing the accused products and services in the United States, and by operating and supporting those products and services for United States customers." The September 12 letter further reserved rights concerning induced and contributory infringement of the Asserted Patents under 35 U.S.C. §§ 271(b) and (c), requested preservation of extensive technical and commercial evidence, and stated that additional patents, claims, products, versions, and theories might be identified. *See* Ex. B at 4-5.

24. The September 12 letter stated that the letter "provides SAP SE, SAP America, Inc., and their respective subsidiaries, affiliates, business units, and controlled entities (collectively, 'SAP') with formal and actual notice under 35 U.S.C. § 287(a) that SAP is infringing, and has infringed, the specifically identified United States patents through the manufacture, use, testing, operation, offer for sale, sale, licensing, importation, provision, and support of the products and services identified in this letter." *See* Ex. B at 1.

25. The September 12 letter further states: "This letter is the first communication that identifies to SAP the specific United States patents and the specific claims charged with infringement. It is intended to remove any possible doubt regarding those patents, claims, accused instrumentalities, and allegations. It constitutes actual notice under 35 U.S.C. § 287(a) as to each patent, claim, and product identified below." *See* Ex. B at 2.

26. PowerBridge also stated that it was willing to engage in discussions concerning a commercial portfolio license, while asserting that the licensing opportunity was limited in duration and subject to change as its licensing and enforcement program advanced. *See* Ex. B at 5.

27. Defendants' specific infringement charges, licensing demand, preservation demand, and reservation of additional infringement theories have placed SAP in a position of uncertainty and risk concerning the continued development, operation, marketing, licensing, support, and provision of the Accused Products.

28. SAP denies that any Accused Product infringes any claim of any Asserted Patent. Defendants' infringement allegations are unfounded and incorrect.

29. Functionality of SAP Business Technology Platform (BTP) is described in documentation at https://help.sap.com/docs/BTP.

30. Information on SAP BTP, Cloud Foundry environment and the SAP BTP Cloud Foundry Runtime is described at https://help.sap.com/docs/btp/btp-admin-guide/9c7092c7b7ae4d49bc8ae35fdd0e0b18.html. Technical details relevant to the operation of Diego, Route Emitter, Gorouter, TCP Router, and the registration and deregistration of application-instance IP and port mappings are described in the Cloud Foundry documentation at https://docs.cloudfoundry.org/concepts/cf-routing-architecture.html and https://docs.cloudfoundry.org/concepts/http-routing.html.

31. Information on SAP Application Router, including its use of routes and destinations to rewrite URLs and forward requests to backend services, is described at https://help.sap.com/docs/btp/sap-business-technology-platform/application-routes-and-destinations and https://help.sap.com/docs/btp/sap-business-technology-platform/html5-apps-routes.

32. Information on SAP Integration Suite and SAP Cloud Integration, including integration flows used to exchange, transform, route, and process messages, is described at https://help.sap.com/docs/integration-suite/sap-integration-suite and https://help.sap.com/docs/cloud-integration. Technical details relevant to SAP's non-infringement position, including the operation of routers, multicasts, splitters, joins, gathers, and communications between integration flows, are described at https://help.sap.com/docs/cloud-integration/cloud-integration-design-capabilities-for-sap-po-7-5-sp28/integration-capabilities and https://help.sap.com/docs/integration-suite/sap-integration-suite/communication-between-integration-flows.

33. Information on the API Management capability of SAP Integration Suite, including API design, publication, governance, security, and traffic management, is described at https://help.sap.com/docs/integration-suite/isuite-integrations-and-apis/api-management.

34. Information on SAP Integration Suite Open Connectors, including its use of prebuilt connectors to integrate third-party cloud applications and API endpoints, is described at https://help.sap.com/doc/00f68c2e08b941f081002fd3691d86a7/2023.20/en-US/c2789fc8f9af44f186a20a4467186e3c.html.

35. Information on SAP Integration Advisor, including its generation of interface, mapping, validation, and transformation runtime artifacts, is described at https://help.sap.com/docs/integration-suite/isuite-integration-advisor/runtime-artifacts.

36. Information on SAP Integration Suite, Advanced Event Mesh is described at https://help.sap.com/docs/SAP_ADVANCED_EVENT_MESH/649cec0ae9ac49059564a1870fb8a1b7/accessing-sap-integration-suite-advanced-event-mesh-user-interface. Technical details relevant to supported Advanced Event Mesh messaging connections and protocols, including AMQP and Solace Message Format, are described at https://help.sap.com/docs/integration-suite/migration-from-event-mesh-capability-in-sap-integration-suite-to-sap-integration-suite-advanced-event-mesh-7a447ab211064dcfacff35ac177ae9b9/adapting-sender-and-consumer-applications.

37. Information on message tracking in SAP Cloud Integration, including Message IDs, Correlation IDs, and Message Processing Logs, is described at https://help.sap.com/doc/978cdb2059244c10b55a8bd916484a63-a4996091c9774e1ba1825ba0566ae3eb/CLOUD/en-US/b4dd641dfd544b76969adec63929d338.html and https://help.sap.com/docs/cloud-integration/sap-cloud-integration/message-processing-log-text-view.

38. Information on SAP Cloud ALM Integration and Exception Monitoring, including the collection and correlation of integration artifacts, interface calls, message flows, messages, and exceptions across components, is described at https://help.sap.com/docs/sap-btp-guidance-framework/integration-architecture-guide/end-to-end-integration-monitoring.

39. Information on SAP Cloud ALM Real User Monitoring, including request flows, monitored components, request types, execution details, performance data, and errors, is described at https://help.sap.com/docs/cloud-alm/applicationhelp/real-user-monitoring.

40. Information on SAP HANA Smart Data Integration, including data replication and transformation services, is described at https://help.sap.com/docs/hana-cloud-database/sap-hana-cloud-sap-hana-database-data-access-guide/data-access-in-sap-hana-cloud-sap-hana-database. Technical details concerning replication tasks that retrieve data from remote-source objects and populate SAP HANA target tables are described at https://help.sap.com/docs/HANA_SMART_DATA_INTEGRATION/cc7ebd3f344a4cdda20966a7617f52d8/4782e36740ab4755be5a1592a6833562.html.

41. Information on SAP Landscape Transformation Replication Server, including real-time replication and synchronization of data from source systems to target systems, is described at https://help.sap.com/docs/SAP_LANDSCAPE_TRANSFORMATION_REPLICATION_SERVER/007c373fcacb4003b990c6fac29a26e4/402d5f564ca7c54de10000000a441470.html and https://help.sap.com/docs/SAP_LANDSCAPE_TRANSFORMATION_REPLICATION_SERVER/007c373fcacb4003b990c6fac29a26e4/99f365564ff6ce54e10000000a441470.html.

42. Information on SAP Datasphere is described at https://help.sap.com/docs/SAP_DATASPHERE. Technical details concerning Replication Flows, including their selection of source and target connections, Data Flows, and Transformation Flows are described at https://help.sap.com/docs/SAP_DATASPHERE/c8a54ee704e94e15926551293243fd1d/10891192186c4920b08939a7b46adc79.html, https://help.sap.com/docs/SAP_DATASPHERE/c8a54ee704e94e15926551293243fd1d/e30fd1417e954577baae3246ea470c3f.html, and https://help.sap.com/docs/SAP_DATASPHERE/c8a54ee704e94e15926551293243fd1d/5bb211a988b14d4b842644bb95fdf255.html.

43. Information on SAP Master Data Integration, including its central master-data hub and synchronization of application-local master-data databases through initial and delta loads, is described at https://help.sap.com/docs/master-data-integration/sap-master-data-integration-prod/synchronization-of-master-data.

44. Information on SAP Business Data Orchestration, including distribution models that identify providers, consumers, source and target systems, schedules, and filters for master-data distribution, is described at https://help.sap.com/docs/master-data-integration/sap-business-data-orchestration-8ce78b673ef04cc1bcfeb01c93ef7885/manage-distribution-model.

45. Information on the SAP S/4HANA Data Replication Framework, including replication from source systems to one or more target systems using replication models, outbound implementations, filters, key mapping, and value mapping, is described at https://help.sap.com/docs/SAP_S4HANA_CLOUD/a630d57fc5004c6383e7a81efee7a8bb/88e3f5577c84bc12e10000000a4450e5.html.

46. Information on SAP Adaptive Server Enterprise, including the Always-On high-availability and disaster-recovery configuration, Cluster Edition, and Component Integration Services, is described at https://help.sap.com/docs/SAP_ASE/a2510813307b4927b8a578ecda22ab94/a6c1b36abc2b1014bac5ca0d2eb200c7.html, https://help.sap.com/docs/SAP_ASE/d9fa5bf217944251be8d0e1c78f06b8b/cd46765d6ecd1014855c401b71e613d7.html, and https://help.sap.com/docs/SAP_ASE/8a49ab5594d643d286ab1437d40b9bb2/a9fc7fb1bc2b10149fe08325c19c990e.html.

47. Information on SAP Replication Server, including inbound and outbound stable queues used to buffer and deliver transactions to routes or database connections, is described at https://help.sap.com/docs/SAP_REPLICATION_SERVER/743c65e47bc4457bbcb1c86b26b3ad85/fe15f65abd1c101480d9833d172e4754.html. Technical details concerning replication definitions, functions, and function strings are described at https://help.sap.com/docs/SAP_REPLICATION_SERVER/075940003f1549159206fcc89d020515/fe70e2e4bd1c1014a0dcd2e977bb57e1.html.

48. Information on SAP Joule, including its conversational interface and integration with SAP solutions, is described at https://help.sap.com/docs/JOULE.

49. The LiveKit WebRTC infrastructure and embedded TURN-server functionality referenced in Defendants' notice are described in the LiveKit deployment documentation and configuration materials at https://docs.livekit.io/transport/self-hosting/deployment/ and https://github.com/livekit/livekit/blob/master/config-sample.yaml.

**THE PARTIES**

50. Plaintiff SAP is a Delaware corporation with its principal place of business at 3999 West Chester Pike, Newtown Square, Pennsylvania 19073, within Delaware County and this District.

51. Defendant PulseLink Systems, LLC is a Texas limited liability company formed on February 6, 2026. PulseLink's Texas Secretary of State records identify its entity address as being located within Pennsylvania. Ex. C . PulseLink's formation records identify the same Pennsylvania address as its initial mailing address and identify Donald Bitting as its managing member at that address. *Id.* at D.

52. Defendant Signal Point Networks, LLC is a Texas limited liability company formed on February 9, 2026. Signal Point's Texas Secretary of State records identify its entity address as being located within Pennsylvania. Ex. E. Signal Point's formation records identify the same Pennsylvania address as its initial mailing address and identify Donald Bitting as its managing member at that address. *Id.* at F.

53. Public property records identify Donald Bitting as the owner of the PulseLink and Signal Point property address in Pennsylvania. Ex. G. The property is located within this District.

54. In March 2026, PulseLink and Signal Point acquired substantial patent portfolios from Avaya LLC. The patent-assignment records filed with the United States Patent and Trademark Office identify each assignee address as the same PulseLink and Signal Point property address in Pennsylvania. Exs. H, I.

55. The patent-assignment records further identify Dr. Donald Bitting at the same PulseLink and Signal Point property address in Pennsylvania as the “Correspondence Data” for the newly assigned patents, with a contact phone number of (484)-332-5731. *Id.*

56. The websites for both PulseLink and Signal Point state that the entities may be contacted at (484) 332-5731. Exs. J, K; https://pulselinksystems.com/contact/; https://signalpointnetworks.com/contact/. The (484) area code is associated with Pennsylvania. *See* https://www.puc.beta.pa.gov/telecommunications/area-codes/.

57. On information and belief, Defendants' management and patent-acquisition, licensing, and enforcement activities have been directed, controlled, or coordinated from Pennsylvania.

**THE ASSERTED PATENTS**

58. The '981 Patent is titled "Systems and Methods of Dynamic Port Assignment" and issued on September 22, 2020. United States Patent and Trademark Office assignment records identify PulseLink as its owner. A true and correct copy of the '981 Patent is attached as Exhibit L.

59. The '385 Patent is titled "Method and Apparatus for Designing Web Services Using a Sequence and Multiplex Architectural Pattern" and issued on April 13, 2010. United States Patent and Trademark Office assignment records identify PulseLink as its owner. A true and correct copy of the '385 Patent is attached as Exhibit M.

60. The '749 Patent is titled "Method, Apparatus, and System for Providing and Using Multi-Protocol Eventing" and issued on October 10, 2017. United States Patent and Trademark Office assignment records identify PulseLink as its owner. A true and correct copy of the '749 Patent is attached as Exhibit N.

61. The '634 Patent is titled "Global Session Identifier" and issued on March 21, 2017. United States Patent and Trademark Office assignment records identify PulseLink as its owner. A true and correct copy of the '634 Patent is attached as Exhibit O.

62. The '030 Patent is titled "System and Method for Monitoring a Network Communication at Multiple Network Layers" and issued on April 24, 2012. United States Patent and Trademark Office assignment records identify Signal Point as its owner. A true and correct copy of the '030 Patent is attached as Exhibit P.

63. The '830 Patent is titled "System for Integrating Diverse Database and Maintaining Their Consistency" and issued on February 9, 2010. United States Patent and Trademark Office assignment records identify Signal Point as its owner. A true and correct copy of the '830 Patent is attached as Exhibit Q.

64. The '915 Patent is titled "Enhancing Privacy by Obscuring Traversal Using Relays Around Network Address Translator (TURN) Connections, and Related Methods, Systems, and Computer-Readable Media" and issued on May 31, 2016. United States Patent and Trademark Office assignment records identify Signal Point as its owner. A true and correct copy of the '915 Patent is attached as Exhibit R.

**JURISDICTION AND VENUE**

65. SAP repeats and re-alleges each allegation above as if fully set forth herein.

66. This action arises under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and under the patent laws of the United States, Title 35 of the United States Code.

67. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

68. An actual, substantial, and immediate controversy exists between SAP and Defendants concerning whether SAP infringes or has infringed the Asserted Patents. Through their September 12 letter, Defendants have expressly and unequivocally charged SAP with infringement of the Asserted Patents, invoked direct infringement under 35 U.S.C. § 271(a), reserved the right to also assert indirect infringement under 35 U.S.C. §§ 271(b) and (c), identified particular "Asserted claims" and "Accused products and functionality," referred to the contents of the letter as "identif[ying] to SAP the specific United States patents and the specific claims charged with infringement" in a manner "intended to remove any possible doubt regarding those patents, claims, accused instrumentalities, and allegations," characterized the September 12 letter as "constitut[ing] actual notice under 35 U.S.C. § 287(a) as to each patent, claim and product" identified, demanded preservation of evidence, and sought a patent license. *See supra*, Factual Background; Ex. B at 1-5. Defendants have also invoked the threat of an broader "substantial Avaya-origin portfolio," without identifying any additional patents or

claims, to compel SAP to engage in licensing discussions with Defendants under threat of possible future patent assertion. These charges, threats, accusations and allegations were made "On behalf of: PulseLink Systems, LLC [and] Signal Point Networks, LLC," the purported owners of the Asserted Patents. *Id.* at 1, 5.

69. This Court has specific personal jurisdiction over PulseLink and Signal Point. Each Defendant has purposefully established substantial contacts with this District, including by identifying a Pennsylvania entity and management address in official corporate records; using that same address in connection with acquisition of the Asserted Patents; conducting Defendants' business from within Pennsylvania, including with respect to the Asserted Patents; and purposefully directing patent-enforcement and licensing activities to SAP at its Newtown Square headquarters in Delaware County, Pennsylvania, where it resides. *See supra*, The Parties.

70. Defendants' patent-enforcement and licensing activities directed toward SAP at its Newtown Square headquarters in Delaware County are the incidents upon which this action is based and to which it pertains. *Id.*

71. SAP's claims arise out of and relate directly to Defendants' patent ownership, acquisition, licensing, and enforcement activities, including their express infringement charges and licensing demand directed to SAP in this District. Exercising personal jurisdiction over Defendants is reasonable and consistent with due process.

72. Defendants' activities directed toward SAP have been carried out, in whole or in part, through PowerBridge, who has represented itself and acted as Defendants' licensing and enforcement agent and representative, including with respect to the September 12 letter and charges, accusations and allegations Defendants have asserted against SAP. See supra at Factual Background. On information and belief, PowerBridge is an intellectual property firm founded by Donald S. Bitting, and located in Pennsylvania. The website for PowerBridge provides a contact number ((484) 332-5731) that is the same Pennsylvania-based contact number identified for Defendants. *See* Ex. S; https://powerbridgenetworks.com/contact/. On information and belief, Defendants have controlled and/or otherwise directed and authorized PowerBridge's activities directed to SAP in this District, including the activities set forth herein giving rise to this action,

such that personal jurisdiction over Defendants in this District would not offend traditional notions of fair play and substantial justice.

73. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and 1391(c)(2) because both Defendants are subject to personal jurisdiction in this District with respect to this action and therefore reside in this District for venue purposes.

74. Venue is independently proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District, including Defendants' patent-acquisition and management activities associated with their Pennsylvania address and their enforcement and licensing activities directed to SAP at its Newtown Square headquarters in Delaware County, Pennsylvania.

75. An immediate, real, and justiciable controversy exists between SAP and Defendants as to whether the Accused Products infringe or have infringed the Asserted Patents.

## FIRST CLAIM FOR RELIEF
## (Declaratory Judgment that SAP Does Not Infringe the '981 Patent)

76. SAP repeats and re-alleges each allegation above as if fully set forth herein.

77. An actual, justiciable, substantial, and immediate controversy exists between SAP and PulseLink concerning whether SAP infringes any claim of the '981 Patent.

78. SAP does not directly or indirectly infringe any claim of the '981 Patent, either literally or under the doctrine of equivalents. Claim 1 requires, among other things, "dynamically reassigning ports associated with the first node to a second node dependent upon a number of instances of the application." Claim 9 requires the computer system to perform operations comprising "dynamically reassigning ports associated with the first node to a second node dependent upon a number of instances of the application." Claim 15 likewise requires computer-readable program code configured to perform "dynamically reassigning ports associated with the first node to a second node dependent upon a number of instances of the application." The '981 Patent Accused Products do not perform at least these limitations. *See* Ex. L ('981 Patent), cls. 1, 9, 15.

79. SAP is entitled to a declaratory judgment that the Accused Products do not infringe any claim of the '981 Patent, directly or indirectly, literally or under the doctrine of equivalents.

**SECOND CLAIM FOR RELIEF**

**(Declaratory Judgment that SAP Does Not Infringe the '385 Patent)**

80. SAP repeats and re-alleges each allegation above as if fully set forth herein.

81. An actual, justiciable, substantial, and immediate controversy exists between SAP and PulseLink concerning whether SAP infringes any claim of the '385 Patent.

82. SAP does not directly or indirectly infringe any claim of the '385 Patent, either literally or under the doctrine of equivalents. Claim 1 requires "identifying compositional logic comprised of a plurality of protocol demultiplexers that implement Web service functionality for demultiplexing, sequencing, and multiplexing said one or more composite messages" and "separating said compositional logic from said service logic, such that said service logic does not include said operations for demultiplexing, sequencing, or multiplexing said one or more composite messages." Claim 7 requires a processor operative to "identify compositional logic comprised of a plurality of protocol demultiplexers" performing those functions and to "separate said compositional logic from said service logic" in the claimed manner. Claim 11 requires a code generator whose processor is operative to identify the claimed protocol-demultiplexer compositional logic, with "said compositional logic . . . separated from service logic, such that said service logic does not include said operations for demultiplexing, sequencing, or multiplexing said one or more composite messages," and to perform "generating code for said compositional logic." The '385 Patent Accused Products do not satisfy at least these limitations. *See* Ex. M ('385 Patent), cls. 1, 7, 11.

83. SAP is entitled to a declaratory judgment that the Accused Products do not infringe any claim of the '385 Patent, directly or indirectly, literally or under the doctrine of equivalents.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Judgment that SAP Does Not Infringe the '749 Patent)**

84. SAP repeats and re-alleges each allegation above as if fully set forth herein.

85. An actual, justiciable, substantial, and immediate controversy exists between SAP and PulseLink concerning whether SAP infringes any claim of the '749 Patent.

86. SAP does not directly or indirectly infringe any claim of the '749 Patent, either literally or under the doctrine of equivalents. Claim 1 requires "the multi-protocol eventing layer comprising a front end of the database, wherein the database comprises an open source, NoSQL database" and a plurality of change requests "comprising both HyperText Transfer Protocol (HTTP) requests and Session Initiation Protocol (SIP) requests," and further requires "sending, by the processor, the change request to a converged container of the multi-protocol eventing layer." Claim 9 requires "an eventing module in communication with the communication server and providing a front end to a database," where the database is an "open source, NoSQL database," the change requests comprise both HTTP and SIP requests, and the eventing module is programmed to "send the change request to a converged container." Claim 15 requires an eventing module receiving database-change requests where "the database comprises an open source, NoSQL database," "the eventing module comprises a front end of the database," and the requests comprise both HTTP and SIP requests. The '749 Patent Accused Products do not satisfy at least these limitations. *See* Ex. N ('749 Patent), cls. 1, 9, 15.

87. SAP is entitled to a declaratory judgment that the Accused Products do not infringe any claim of the '749 Patent, directly or indirectly, literally or under the doctrine of equivalents.

**FOURTH CLAIM FOR RELIEF**

**(Declaratory Judgment that SAP Does Not Infringe the '634 Patent)**

88. SAP repeats and re-alleges each allegation above as if fully set forth herein.

89. An actual, justiciable, substantial, and immediate controversy exists between SAP and PulseLink concerning whether SAP infringes any claim of the '634 Patent.

90. SAP does not directly or indirectly infringe any claim of the '634 Patent, either literally or under the doctrine of equivalents. Claim 1 requires receiving a first message in connection with "a first communication session that spans a plurality of Back-to-Back User Agents (B2BUAs)" and a second message in connection with "a second communication session, that also spans the plurality of B2BUAs"; it further requires "examining, by the communication server, at least one of a URI, a header, a parameter, or an attachment of the second message" for association information and configuring a transmitted message "to incorporate the first and second global session identifiers." Claim 12 requires "wherein the first communication session spans a plurality of Back-to-Back User Agents (B2BUAs)," "detecting, by the communication server, a topology change in the first communication session," assigning the modified session a second GSID that provides an indication of that topology change and associates the sessions, and "configuring the at least one message to incorporate the first and second global session identifiers." Claim 17 requires a communication server configured to receive messages for "a first communication session that spans a plurality of Back-to-Back User Agents (B2BUAs)" and "a second communication session that also spans the plurality of B2BUAs" and, based on examination of "at least one of a URI, a header, a parameter, or an attachment of the second message," to configure a message "to incorporate the first and second global session identifiers." The '634 Patent Accused Products do not satisfy at least these limitations. *See* Ex. O ('634 Patent), cls. 1, 12, 17.

91. SAP is entitled to a declaratory judgment that the Accused Products do not infringe any claim of the '634 Patent, directly or indirectly, literally or under the doctrine of equivalents.

**FIFTH CLAIM FOR RELIEF**

**(Declaratory Judgment that SAP Does Not Infringe the '030 Patent)**

92. SAP repeats and re-alleges each allegation above as if fully set forth herein.

93. An actual, justiciable, substantial, and immediate controversy exists between SAP and Signal Point concerning whether SAP infringes any claim of the '030 Patent.

94. SAP does not directly or indirectly infringe any claim of the '030 Patent, either literally or under the doctrine of equivalents. For example, the '030 Patent Accused Products do not infringe any of the '030 Patent Asserted Claims at least because those products lack separate media-path and signaling-path bills of materials for the same communication, and packet-level signaling/media classification and responsive association as required by the claims, and therefore do not include "a network monitor configured to get a media path bill of materials for the communication between a plurality of communication devices across a network, get a signaling path bill of materials for the communication between the plurality of communication devices across the network, wherein the media path bill of materials and the signaling path bill of materials each comprise a plurality of items, and wherein the media path bill of materials and the signaling path bill of materials comprise a communication path bill of materials" (claim 1), "wherein one or more of the network monitor and at least one of the plurality of network analyzers are further configured to determine if one of the one or more packets is a signaling packet or a media packet, in response to the one of the one or more packets being the signaling packet, associating the status in the signaling packet with an item in the signaling path bill of materials, and in response to the one of the one or more packets being the media packet, associating the status in the media packet with an item in the media path bill of materials" (claim 1), "getting at a network monitor a media path bill of materials for the communication between a plurality of communication devices across a network" (claim 16), "getting a signaling path bill of materials for the communication between the plurality of communication devices across the network, wherein the media path bill of materials and the signaling path bill of materials each comprise a plurality of items, and wherein the media path bill of materials and the signaling path bill of materials comprise a communication path bill of materials" (claim 16), "determining in one or more of the network monitor and at least one of the plurality of network analyzers if one of the one or more packets is a signaling packet or a media packet" (claim 16), "responsive to the one of the one or more packets being the signaling packet, associating the status in the signaling packet with an item in the signaling path bill of materials" (claim 16), or "responsive to the one of the one or more packets being the media packet, associating the status in the media packet

with an item in the media path bill of materials" (claim 16), as required by the claims. *See* Ex. P ('030 Patent), cls. 1, 16.

95. SAP is entitled to a declaratory judgment that the Accused Products do not infringe any claim of the '030 Patent, directly or indirectly, literally or under the doctrine of equivalents.

**SIXTH CLAIM FOR RELIEF**
**(Declaratory Judgment that SAP Does Not Infringe the '830 Patent)**

96. SAP repeats and re-alleges each allegation above as if fully set forth herein.

97. An actual, justiciable, substantial, and immediate controversy exists between SAP and Signal Point concerning whether SAP infringes any claim of the '830 Patent.

98. SAP does not directly or indirectly infringe any claim of the '830 Patent, either literally or under the doctrine of equivalents. For example, the '830 Patent Accused Products do not infringe any of the '830 Patent Asserted Claims at least because those products do not include the update sequencing and materialized-union architecture required by the claims, and therefore do not include "where said controller retrieves an update from said queue and, sequentially, applies each retrieved update to an outbound filter of each of said satellite databases and to said materialized database" (claims 1 and 2), "where said controller applies said each update to said materialized database after said each update has been applied to all of said satellite databases" (claim 1), or "selecting a satellite database as a target database to update … returning to said step of selecting, to select another satellite database and repeat said steps of converting and communicating … where said step of returning to said step of selecting selects said materialized database after all of said satellite databases have been selected" (claim 12), as required by the claims. *See* Ex. Q ('830 Patent), cls. 1, 2, 12.

99. SAP is entitled to a declaratory judgment that the Accused Products do not infringe any claim of the '830 Patent, directly or indirectly, literally or under the doctrine of equivalents.

## SEVENTH CLAIM FOR RELIEF
## (Declaratory Judgment that SAP Does Not Infringe the '915 Patent)

100. SAP repeats and re-alleges each allegation above as if fully set forth herein.

101. An actual, justiciable, substantial, and immediate controversy exists between SAP and Signal Point concerning whether SAP infringes any claim of the '915 Patent.

102. SAP does not directly or indirectly infringe any claim of the '915 Patent, either literally or under the doctrine of equivalents. For example, the '915 Patent Accused Products do not infringe any of the '915 Patent Asserted Claims at least because those products do not perform the required masking or select a second TURN relayed transport address based on the first TURN relayed transport address in the manner claimed, and therefore do not include "receiving, by the TURN server, a request for a provision of a second TURN service … [and] selecting a second TURN relayed transport address for the provision of the second TURN service based on the first TURN relayed transport address" (claims 1 and 9), "masking, by the TURN server, a presence of the TURN server to the TURN peer … [and] relaying, by the TURN server, communications between the TURN client and the TURN peer using a first TURN relayed transport address, the relaying based on the masking" (claims 1 and 9), "select a second TURN relayed transport address for the provision of the second TURN service based on the first TURN relayed transport address" (claim 8), or "mask a presence of the TURN server to the TURN peer … [and] relay communications between the TURN client and the TURN peer using a first TURN relayed transport address, the relaying based on the masking" (claim 8), as required by the claims. *See* Ex. R ('915 Patent), cls. 1, 8, 9.

103. SAP is entitled to a declaratory judgment that the Accused Products do not infringe any claim of the '915 Patent, directly or indirectly, literally or under the doctrine of equivalents.

## DEMAND FOR A JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38, SAP demands a jury trial on all issues and claims so triable.

**SAP'S PRAYER FOR RELIEF**

SAP respectfully requests that the Court enter judgment and grant relief as follows:

(a) Declaring that SAP does not directly or indirectly infringe any claim of the '981 Patent, either literally or under the doctrine of equivalents;

(b) Declaring that SAP does not directly or indirectly infringe any claim of the '385 Patent, either literally or under the doctrine of equivalents;

(c) Declaring that SAP does not directly or indirectly infringe any claim of the '749 Patent, either literally or under the doctrine of equivalents;

(d) Declaring that SAP does not directly or indirectly infringe any claim of the '634 Patent, either literally or under the doctrine of equivalents;

(e) Declaring that SAP does not directly or indirectly infringe any claim of the '030 Patent, either literally or under the doctrine of equivalents;

(f) Declaring that SAP does not directly or indirectly infringe any claim of the '830 Patent, either literally or under the doctrine of equivalents;

(g) Declaring that SAP does not directly or indirectly infringe any claim of the '915 Patent, either literally or under the doctrine of equivalents;

(h) Permanently enjoining Defendants, and their respective officers, agents, servants, employees, attorneys, and persons acting on their behalf or in active concert with them, from charging or threatening that any SAP products infringe any patents in the "substantial Avaya-origin portfolio," including the Asserted Patents, under any subsection of 35 U.S.C. § 271;

(i) Declaring this case exceptional under 35 U.S.C. § 285 and awarding SAP its reasonable attorneys' fees and expenses;

(j) Awarding SAP its costs of suit; and

(k) Granting SAP such other and further relief as the Court deems just and proper.

Dated: October 29, 2026

Respectfully submitted,

VENABLE LLP

By: _/s/Jeffri A. Kaminski_______________
Jeffri A. Kaminski (PA Bar No. 79229)

VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: (202) 344-8300
jakaminski@Venable.com

Frank C. Cimino (pro hac vice forthcoming)
Megan S. Woodworth (pro hac vice forthcoming)
Jason M. Dorsky (pro hac vice forthcoming)
VENABLE LLP
600 Massachusetts Ave NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: (202) 344-8300
fccimino@venable.com
mswoodworth@Venable.com
jmdorsky@venable.com

*Attorneys for Plaintiff SAP America, Inc.*